UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:  RICHARD GILBERT DIETRICH,  :   Case No. 17-13378REF
          Debtor             :   Chapter 7

-------------------------------------------------------------------------

LEHIGH VALLEY HOSPITAL,      :   Adv. No. 17-259
          Plaintiff       :
          vs.             :
RICHARD GILBERT DIETRICH,  :
          Defendant     :

# <u>MEMORANDUM  OPINION</u>

## I. <u>INTRODUCTION</u>

Debtor/Defendant, Richard Gilbert Dietrich ("Dietrich") needed brain

surgery. The medical facility that he chose for his procedure was Plaintiff, Lehigh

Valley Hospital (the "Hospital"). His health insurance carrier, however, identified

the Hospital as non-participating. This meant that his health insurance carrier

would not pay the Hospital directly; it would pay Dietrich the amount of the

Hospital bills. Dietrich was then personally responsible to pay the insurance

proceeds to the Hospital. Dietrich signed consent forms that establish his liability

for services that the Hospital provided to him and through which he assigned all of

his interest in insurance benefits to the Hospital. Dietrich, however, says that he

neither read nor understood the consents and therefore was not bound by their

terms. When he received three checks totaling $95,674.36 from his health

insurance carrier for his brain surgery, he kept them, deposited them into his own

account, and spent them, failing to pay the insurance proceeds to the Hospital.

In this case, I am called upon to determine whether the $95,674.36

debt admittedly owed by Dietrich to the Hospital should not be dischargeable. I

find and conclude that Dietrich's conduct amounted to fraudulent

misrepresentation and willful and malicious conduct. The debt owed to the

Hospital by Dietrich is therefore nondischargeable under both section 523(a)(2)(A)

and section 523(a)(6) of the Bankruptcy Code. I will rule in favor of the Hospital,

concluding that the full amount of the debt is not dischargeable.

## II. **FACTUAL BACKGROUND**

Dietrich received treatment for a brain tumor at the Hospital in the

first half of 2016. On January 15, 2016, the Hospital contacted Dietrich and

notified him that the Hospital was a non-participating provider with Dietrich's

insurance company, Capital BlueCross. That meant that Capitol BlueCross would

not pay the Hospital's fees directly, but would pay Dietrich who would then pay

the Hospital. But Dietrich claims to be unaware how the anticipated payment to the

Hospital would be made by Capital BlueCross. He failed to question both the

Hospital and Capital BlueCross about what effect the Hospital's status as a non-

participating provider would have on his ability and obligation to pay the Hospital

for medical services. Dietrich also decided not to read his insurance policy to determine how payment would be made to a non-participating provider such as the Hospital. Dietrich acknowledged, however, that had he read his policy, he would have learned that Capital BlueCross would remit payment for medical services directly to him and not to the Hospital as a non-participating provider. Prior to receiving treatment from the Hospital, Dietrich executed three Consents for Treatment, in which he agreed to pay for services rendered to him by the Hospital. More directly on point in this dispute, Dietrich assigned to the Hospital any insurance proceeds he would receive as payment for the services provided by the Hospital.

After receiving medical services from the Hospital, Dietrich received bills from the Hospital for these medical services. He also received three checks totaling $95,674.36 from Capital BlueCross as payment for the services he received from the Hospital. Dietrich does not dispute that he endorsed these checks, deposited the proceeds into his personal bank account, and spent the money. When he endorsed the checks, deposited the proceeds into his personal account, and spent the funds, Dietrich was aware that the Hospital was a non-participating provider with Capital BlueCross.

The Hospital initiated this litigation, maintaining that Dietrich's conduct was fraudulent and willful and malicious and that the debt he owes to the

Hospital should not be dischargeable under section 523(a)(2)(A) and (6). Dietrich's sole defense is that he was not aware that the checks he received from Capital BlueCross were intended as payment for the services provided by the Hospital. He further claims that the Hospital failed to prove that his conduct was fraudulent, willful, and malicious. Fundamentally, this case hangs upon Dietrich having no reasonable belief that the $95,674.36 he received was his to keep and spend.

# III. PROCEDURAL HISTORY

The Hospital initiated this adversary proceeding by filing and serving its complaint against Dietrich on August 24, 2017 claiming that the $95,674.36 debt owed to it by Dietrich is not dischargeable under 11 U.S.C. §523(a)(2)(A) and (6). Dietrich filed his answer to the complaint on September 19, 2017. On April 20, 2018, the Hospital filed a motion for summary judgment, which I denied in my Order entered on May 16, 2018, because some critical facts were in dispute. Trial was thereafter held on August 13, 2018 and the parties filed post-trial briefs. This matter is now ready for my disposition. As noted above, I will rule in favor of the Hospital, concluding that the full amount of the debt of $95,674.36 is not dischargeable.

# IV.  **DISCUSSION**

## A. **Dietrich is bound by the terms of the Consents for Treatment he signed and therefore is obliged to pay the Hospital for the services he received and to have remitted the proceeds of the insurance to the Hospital.**

Prior to receiving treatment from the Hospital, Dietrich signed three identical Consents for Treatment. The Consents obligate Dietrich to pay the Hospital for the services it renders to Dietrich. They also require that Dietrich assign to the Hospital all insurance benefits he receives for services rendered by the Hospital to Dietrich. See the Hospital's Exhibits A, B, & C. Dietrich does not dispute that he signed these documents, but he suggests he is not bound by their terms because he neither read nor understood their contents. That is just plain wrong.

Pennsylvania law, as applied both in state courts and in federal courts, is crystal clear that neither the failure to read a document nor the lack of understanding of its terms is a defense to the enforceability of the document. Schillachi v. Flying Dutchmen Motorcycle Club, 751 F. Supp. 1169, 1174-75 (E.D. Pa. 1990); see also Wells Fargo Bank, N.A. v. Yung, 317 F. Supp. 3d 879, 887 (E.D. Pa. 2018). As the District Court stated in Yung:

> Under Pennsylvania law, a party who signs a contract is responsible for reading the contract. See Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1174–75 (E.D. Pa. 1990) (citing Bessen Bros., Inc. v. Brooks, 176 Pa. Super. 430, 107 A.2d 623 (1954)). In the absence of fraud, ignorance of the contract's contents does not excuse the signing party from performing the obligations of the contract. See id. at 1175.

Yung, 317 F. F. Supp. 3d at 887. Furthermore, a party who seeks to have another

party sign a contract has no duty to insure that the other party reads the contract or

fully understands its terms. Arce v. U–Pull–It Auto Parts, Inc., Civil Action No.

06–5593, 2008 WL 375159, at *5–9 (E.D. Pa. Feb. 11, 2008); see also Wroblewski

v. Ohiopyle Trading Post, Inc., Civil Action No. 12–0780, 2013 WL 4504448, at

*7 (W.D. Pa. Aug. 22, 2013).

    Dietrich has neither proven, nor even alleged, fraud by the Hospital in

inducing him to sign the Consents for Treatment. Dietrich is therefore bound by

the terms of these documents despite his claims to have never read them. Yung,

317 F. Supp. 3d at 887; Schillachi, 751 F. Supp. at 1174-75. See also PHC-

Martinsville, Inc. v. Dennis, Record No. 161019, 2017 WL 4053898, at *2 (Va.

September 14, 2017), in which the Virginia Supreme Court ruled that a patient was

bound by the terms of a Consent for Services and Financial Responsibility

document even though he signed it without first reading it. The patient was in the

hospital emergency room experiencing what he thought was a heart attack. The

Virginia Supreme Court concluded that patient's signature on the document was a

6

manifestation of his intent to agree to its terms. The court further found that the

Hospital's use of a standard-form contract and the disparity in bargaining power

between the parties did not affect the patient's ability to assent to its terms.

Dietrich argues that he is not bound by the terms of the Consents for

Treatment because he did not understand their terms. Under Pennsylvania law,

however, a party is responsible for not only reading a contract, but also for

understanding its contents as well. Therefore, a party's lack of either knowledge or

understanding of the terms of a contract does not void or otherwise affect the

enforceability of the contract. Yung, 317 F. Supp. 3d at 887. Dietrich is therefore

bound by the terms of the Consents for Treatment even though he professes not to

have read them and not to have understood their terms.

## B. Burden of proof in nondischargeability action under 11 U.S.C. §523(a).

"One of the chief purposes of the Bankruptcy Code is to provide

honest debtors with a 'fresh start,' free from the 'weight of oppressive

indebtedness.'" Oppenheimer & Co. v. Ricker (In re Ricker), 475 B.R. 445, 455

(Bankr. E.D. Pa. 2012), citing Ins. Co. of North America v. Cohn (In re Cohn), 54

F.3d 1108, 1113 (3d Cir. 1995). Exceptions to discharge are therefore narrowly

construed against creditors and liberally construed in favor of debtors. Cohn, 54

F.3d at 1113; Ricker, 475 B.R. at 455. In keeping with this philosophy, the burden

of proof in an adversary proceeding challenging the dischargeability of a debt

under section 523(a) is on the creditor, who must prove his case by a

preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991);

Ricker, 475 B.R. at 455.

## C. **The Hospital met its burden of proving that the debt is not dischargeable under 11 U.S.C. §523(a)(6).**

Section 523(a)(6) excepts from discharge any debt for "willful and

malicious injury by the debtor to another entity or to the property of another

entity." 11 U.S.C. §523(a)(6). To have a debt found nondischargeable under

section 523(a)(6), the Hospital must prove by a preponderance of the evidence that

(1) Dietrich's conduct was both "willful and malicious," and (2) injury resulted to

the Hospital from Dietrich's conduct. Nakonetschny v. Rezykowski (In re

Rezykowski), 493 B.R. 713, 721 (Bankr. E.D. Pa. 2013).

A willful injury is one that is done deliberately or intentionally.

Rezykowski, 493 B.R. at 721; GMAC Inc v. Coley (In re Coley), 433 B.R. 476,

497 (Bankr. E.D. Pa. 2010). While section 523(a)(6) does not encompass reckless

acts that lead to injury, see Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998),

deliberate actions that are substantially certain to produce injury are willful within

the meaning of §523(a)(6). Coley, 433 B.R. at 497, citing Conte v. Gautam (In re

Conte), 33 F.3d 303, 307-09 (3d Cir 1994). See also Rezykowski, 493 B.R. at 721-

22.

        In addition to being willful, section 523(a)(6) also requires that the

injury be malicious. Rezykowski, 493 B.R. at 722.  As Judge Frank explained

through his reliance on previous decisions on the issue of maliciousness:

> "Malice" is distinct from willfulness. The commonly-accepted
> definition of malice encompasses an injury that is "wrongful and
> without just cause or excuse, even in the absence of personal hatred,
> spite or ill-will." In re Jacobs, 381 B.R. 128, 138–39 (Bankr. E.D. Pa.
> 2008); 4 Collier on Bankruptcy ¶ 523.12[2] (Alan N. Resnick and
> Henry J. Sommer eds., 16th ed. 2013). A plaintiff is not required to
> prove that the debtor acted with "specific malice." Conte, 33 F.3d at
> 308 (quoting St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d
> 1003, 1009 (4th Cir. 1985)). In a § 523(a)(6) proceeding, a debtor may
> act with malice without bearing any subjective ill will toward the
> Hospital/creditor or any specific intent to injure the same. In re
> Wooten, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010); In re Davis, 262
> B.R. 663, 670–71 (Bankr. E.D. Va. 2001).

Rezykowski, 493 B.R. at 722. I agree with Judge Frank's adoption of the above

decisions and his conclusion relating to malicious injury derived from them.

        Finally, willful and malicious injury under section 523(a)(6) includes

a willful and malicious conversion. Wilmington Trust Co. v. Behr (In re Behr), 42

B.R. 922, 925 (Bankr. E.D. Pa. 1984); R.T. Vagley, M.D. v. Lavitsky (In re

Lavitsky), 11 B.R. 570, 571 (Bankr. W.D. Pa. 1981), citing 95 Cong. R.H. 11096

(September 28, 1978). Conversion is defined as "... any unauthorized act which deprives an owner of his property permanently or for an indefinite time." First Valley Bank v. Ramonat (In re Ramonat), 82 B.R. 714, 721 (Bankr. E.D. Pa. 1988), citing Behr, 42 B.R. at 925.

To show that the $95,674.36 debt is nondischargeable under section 523(a)(6), therefore, the Hospital must establish by a preponderance of the evidence: (1) Dietrich's conduct was deliberate and substantially certain to cause injury to the Hospital (the willfulness); and (2) Dietrich acted wrongfully and without just cause or excuse when he spent the proceeds of the insurance checks and never paid the Hospital for the services it rendered to him (the malice); and (3) the Hospital suffered an injury as a result of Dietrich's conduct (the damages).

It is undisputed that the Hospital provided medical services to Dietrich on three occasions in the first half of 2016. Dietrich visited the Hospital's facility on January 8, 2016, for an MRI. He was later admitted to the Hospital's facility for a period of four days[1] on February 1, 2016 for in-patient surgery. After the surgery, Dietrich received a follow-up MRI in June of 2016 at the Hospital's facility. It is also undisputed that prior to receiving each of these three services, Dietrich signed

---

[1]      During the trial, counsel for the Hospital asked Dietrich if he was admitted to the Hospital for in-patient surgery for approximately three days, to which Dietrich responded, "yes." Notes of Testimony, August 13, 2018 trial at p.37. A review of the bill provided by the Hospital to Dietrich for this in-patient surgery, however, reveals that Dietrich was admitted to the Hospital's facility for a period of four days, from February 1, 2018 through February 4, 2018. Plaintiff's Exhibit E.

the three separate Consents for Treatment. In the Consents for Treatment, Dietrich agreed to pay for the services rendered to him by the Hospital and he assigned to the Hospital any insurance proceeds he would receive as payment for those services. See the Hospital's Exhibits A, B, C.

Some time before January 15, 2016, Heather Klemped ("Ms. Klemped"), a medical assistant employed by the Hospital, discovered, as part of her ordinary duties, that the Hospital was a non-participating provider with Dietrich's insurance carrier, Capital BlueCross. On January 15, 2016, as part of her ordinary duties with the Hospital, Ms. Klemped contacted Dietrich by telephone and notified him that the Hospital was not a participating provider with Capital BlueCross. See the Hospital's Exhibit N. Although he could not recall the exact date, Dietrich testified that a hospital employee contacted him at some point to advise him that his insurance was not honored at the Hospital's facility. Notes of Testimony August 13, 2018 trial ("N.T."), at p. 38.

In addition, the Hospital presented the testimony of Melanie Hartzell ("Ms. Hartzell"), a call center manager with Capital BlueCross, who verified the authenticity of a Capital BlueCross call log admitted into evidence as the Hospital's Exhibit O. This call log reflects that Dietrich telephoned Capital BlueCross on January 13, 2016 to inquire which hospitals participated with his

insurance carrier. The log further reflects that Dietrich was informed that another medical provider, St. Luke's University Health Network, was a participating provider and that Dietrich was not happy that the Hospital's facility was not a participating provider. See N.T. at p. 39; and the Hospital's Exhibit O. Dietrich did not recall making this phone call, although he testified that he had no reason to dispute that he had in fact made the call. N.T. at p. 39.

I find and conclude that Dietrich knew, on January 13, 2016 at the very latest, that the Hospital was a non-participating provider with his insurance carrier. Despite this knowledge, Dietrich never questioned what effect the Hospital's status as a non-participating provider would have on the its being paid by Capital BlueCross for the services it rendered to Dietrich. See March 6, 2016 Deposition of Dietrich ("Dietrich Deposition"), at p. 12.[2] In addition, Dietrich testified that he never took any steps to inquire of either the Hospital or Capital BlueCross how the services the Hospital provided would be paid. N.T. at pp. 41-2. Finally, at this time, Dietrich failed to read his insurance policy to determine how payment would be made to the Hospital, a non-participating provider. Dietrich acknowledged, however, that had he read his policy, he would have learned that

---

[2]    Although the Hospital did not offer the Dietrich Deposition into evidence, it did attach it to its Motion for Summary Judgment as Exhibit C. Dietrich has not objected to the Hospital's references to the Dietrich Deposition in its brief. I therefore consider those portions of the Dietrich Deposition cited in the Hospital's brief as evidence in this adversary proceeding.

Capital BlueCross would remit payment for medical services directly to him and not to the non-participating provider. Dietrich Deposition, at pp. 70-71.

The evidence established that Dietrich received the first check from Capital BlueCross for services rendered by the Hospital, which check was dated January 26, 2016, in the amount of $4,029.26, and made payable to Dietrich. The check was attached to an Explanation of Benefits form. The Explanation of Benefits form that accompanied this check states that the check was sent as payment for the MRI and radiology services received by Dietrich on January 8, 2016. The Hospital is clearly listed as the provider of the services at the top of the Explanation of Benefits form. See the Hospital's Exhibit R. Dietrich acknowledged receiving and endorsing the check, depositing the $4,029.26 into his personal bank account on February 1, 2018, and spending the proceeds. See N.T. at pp. 46-47, 50, 58; Hospital's Exhibit R. Dietrich admitted that made no attempt to read the Explanation of Benefits form to try to understand why he received the $4,029.26 check. N.T. at p. 48. He further testified that he had never previously received an insurance check. He assumed that the check constituted an overpayment and that Capital BlueCross would not send him a check made payable to him without good reason. N.T. at p. 49.

Dietrich also testified that after he received this check, he and a friend made an anonymous phone call to Capital BlueCross using his friend's phone to determine why he received the check. Dietrich maintains that the woman who answered the phone never asked him for identifying information, N.T. at pp. 49-57. Ms. Hartzell, a Capital BlueCross call center manager, however, credibly testified that Capital BlueCross is required by law to obtain identifying information from all callers and there are no instances in which a representative would provide specific information to a caller without first obtaining such information. N.T. at p. 26. Dietrich further maintains that he asked the woman who answered the phone the general question why he received the check but did not provide her with any identifying information so she could advise him why he received the check.

Dietrich further testified that the woman provided him with several reasons why he may have received the check; that it could be for an overpayment of some kind, it could have something to do with deductibles, or it could be for payment of a doctor's bill. N.T. at pp. 53-55. He further testified that the woman advised him that since the check was made payable to him, he should deposit it, N.T. at 53-54, but that she never told him to spend the proceeds of the check. N.T. at p. 58.[3]

---

[3]    In an attempt to confirm that this anonymous call was in fact made, Dietrich made another, identical call to Capital BlueCross in June 2018. The Capital BlueCross representative who answered the

Why did Dietrich use this convoluted, confidential communication about the money he received? Because he wanted to keep it and did not want to give specific facts that might lead to a statement that he had to pay the money to the Hospital. This is the only explanation for his clandestine call to BlueCross.

Dietrich received the second check from Capital BlueCross for services rendered by the Hospital, which check was dated February 25, 2016, in the amount of $83,707.92, and made payable to Dietrich. Once again, the check was attached to an Explanation of Benefits form. The Explanation of Benefits form states that the check was for payment of an itemized list of seventeen different services, including room and board for a semi-private room and for intensive care, radiology, pharmacy and lab services, medical and surgical supplies, occupational therapy services, and an MRI, all provided to Dietrich by the Hospital from February 1, 2016 through February 4, 2016. Again, the Hospital is clearly identified as the provider of the services at the top of the Explanation of Benefits form. See the Hospital's Exhibit S. And again, Dietrich acknowledged receiving and endorsing this check, depositing it into his personal bank account, and

---

call, however, refused to provide any information to Dietrich without first obtaining identifying information from him. Because the insurance policy was no longer in effect, Dietrich could not provide an insurance identification card number, but he did provide the call center representative with his social security number. Although the representative advised Dietrich to deposit a check made payable to him, once again, Dietrich did not ask why he received the check, and the representative did not advise Dietrich that the proceeds of the check belonged to him. N.T. at pp. 62-64.

spending the proceeds. See N.T. at pp. 68-69, 70-71; Hospital's Exhibit S. Dietrich

did not contact Capital BlueCross to inquire why he received this check, N.T. at p.

70, and he never looked at the Explanation of Benefits that accompanied this

check. N.T. at pp.71-72.

Dietrich received the third check from Capital BlueCross for services

rendered by the Hospital, which check was dated June 21, 2016, in the amount of

$7937.18, and made payable to Dietrich. Once again, this check was attached to an

Explanation of Benefits form. The Explanation of Benefits form that accompanied

this check states that the check was being sent as payment for an MRI and

radiology services provided to Dietrich by the Hospital on June 2, 2016. Again, the

Hospital is clearly listed as the provider of the services on the Explanation of

Benefits form. See the Hospital's Exhibit T. And again, Dietrich acknowledged

receiving and endorsing this check, depositing it into his personal bank account,

and spending the proceeds. See N.T. at pp. 75-76; Hospital's Exhibit T. Dietrich

did not contact Capital BlueCross to inquire why he received this check, N.T. at

pp. 76-77.

Dietrich admits that he received numerous bills from the Hospital, but

that he never looked at or paid attention to them, choosing instead to simply place

them on a pile with other bills. N.T. at pp. 58-60, 71, 79. Dietrich also admits that

he never paid any of the bills he received from the Hospital. N.T. at pp. 72, 79.

Based upon these facts, as recited above and discussed below, I find

and conclude that the Hospital met its burden of proving that Dietrich engaged in

willful and malicious conduct that resulted in injury to the Hospital.

First, I find and conclude that Dietrich's conduct was willful under

section 523(a)(6) because it was deliberate and was substantially certain to produce

injury to the Hospital. Coley, 433 B.R. at 497, citing Conte, 33 F.3d at 307-09; see

also Rezykowski, 493 B.R. at 721-22. Dietrich signed the Consents for Treatment

before he received treatment from the Hospital, before he received and deposited

the checks from Capital BlueCross, and before he spent the proceeds. He was

obligated to pay the Hospital for the services he received and to turn over to the

Hospital the proceeds from the insurance checks when he received them. To the

contrary, with his head buried deep in the sand, Dietrich deposited the checks into

his personal bank account, spent the proceeds, and never paid the Hospital for the

services it rendered to him. Dietrich's conduct was deliberate and substantially

certain to cause injury to the Hospital because Dietrich had no alternative way to

pay the Hospital for its services after he spent the insurance proceeds. For these

reasons, I find and conclude that Dietrich acted willfully when he spent the insurance proceeds without paying the Hospital for the services it rendered to him.

I also find and conclude that Dietrich's conduct was malicious as that term is used in section 523(a)(6) because it was wrongful and without just cause or excuse. Rezykowski, 493 B.R. at 722; Viener v. Jacobs (In re Jacobs), 381 B.R. 128, 138-39 (Bankr. E.D. Pa. 2008). It is not necessary that I find that Dietrich acted with "specific malice" towards the Hospital, Conte, 33 F.3d at 307-09, or that he had a specific intent to injure the Hospital when he spent the insurance proceeds and never paid the Hospital for the services it rendered to him. For me to find malice under section 523(a)(6), I must find that Dietrich's conduct was wrongful and without just cause or excuse. Conte, 33 F.3d at 307-09; Ocean Equity Group, Inc. v. Wooten (In re Wooten), 423 B.R. 108, 130 (Bankr. E.D. Va. 2010); Jacobs, 381 B.R. at 138–39; Johnson v. Davis (In re Davis), 262 B.R. 663, 670–71 (Bankr. E.D. Va. 2001).

Dietrich acted wrongfully and maliciously when he spent the insurance proceeds without paying the Hospital's bills. Dietrich had no interest in the insurance proceeds when he engaged in this conduct because he had assigned his interest in the insurance proceeds to the Hospital under the Consents for Treatment. Furthermore, Dietrich offered no plausible or credible explanation for

his conduct that would justify my finding that it might be excused for just cause or any other valid reason. Dietrich argues that his conduct should be excused because he was dealing with having a brain tumor and later recovering from brain tumor surgery and taking pain medication, all of which allegedly impacted his mental faculties. I find this testimony is not credible. Dietrich failed to introduce any evidence from a medical professional to corroborate his testimony. Furthermore, at least twice, Dietrich made clandestine attempts to determine his obligations relating to the insurance proceeds. Now, when confronted by his actual knowledge or the possibility that he could have obtained critical information through a legitimate call to Capitol BlueCross, Dietrich proverbially rolls his eyes and declares, "I know nothing. NOTHING."[4] Dietrich's conduct was malicious as that term is used in section 523(a)(6).

Finally, as stated earlier, Dietrich had no interest in the insurance proceeds when he engaged in this conduct because he had assigned all of his interest in the insurance proceeds to the Hospital under the Consents for Treatment. Therefore, Dietrich's conduct also qualifies as willful and malicious under section

---

[4]    Without overly demeaning this case or its parties, I refer to John Banner (Sergeant Hans Schultz) in the long running television sit-com Hogan's Heroes, who, when confronted by knowledge or obtaining information that he did not like, responded as set forth above.

523(a)(6) because it constitutes a willful and malicious conversion of property that rightfully belonged to the Hospital. <u>Behr</u>, 42 B.R. at 925; <u>Lavitsky</u>, 11 B.R. at 571.

Dietrich's spending the insurance proceeds without paying the Hospital for the services it rendered to him constitutes conversion because it was unauthorized conduct which permanently deprived the Hospital of its property. <u>Ramonat</u>, 82 B.R. at 721; <u>Behr</u>, 42 B.R. at 925. As discussed above, the conversion was willful because it was deliberate and substantially certain to cause injury to the Hospital. <u>Coley</u>, 433 B.R. at 497, citing <u>Conte</u>, 33 F.3d at 307-09; <u>see</u> <u>also</u> <u>Rezykowski,</u> 493 B.R. at 721-2. It was also malicious because it was a wrongful act taken without just cause or excuse. <u>Conte</u>, 33 F.3d at 307-09; <u>Rezykowski</u>, 493 B.R. at 722; <u>Wooten</u>, 423 B.R. at 130; <u>Jacobs</u>, 381 B.R. at 138–39; <u>Davis</u>, 262 B.R. at 670–71. Finally, Dietrich's conduct caused injury to the Hospital because it deprived the Hospital of the insurance proceeds and left the Hospital with no prospect of being paid for the services it rendered to Dietrich.

Dietrich's aversion to learning about the financial aspects of his insurance payments and his responsibilities relating to his pending operation at the Hospital was manifested by the following efforts to avoid learning what he would owe and how he would pay for it:

Dietrich knew the Hospital was a non-participating provider with
Capitol BlueCross, but he chose to receive the treatment from
the Hospital rather than changing to another hospital.

Dietrich did not read the Consents for Treatment, which contained his
assignment of benefits.

Dietrich made no inquiry about how the Hospital would be paid if he
kept the insurance proceeds.

Dietrich did not read the Explanations of Benefits.

Dietrich did not ask for specific advice or explanations from
representatives of Capitol BlueCross about whether the checks
he received were his or the Hospital's.

Dietrich did not ask for specific advice or explanations from
representatives of the Hospital about whether the checks
he received were his or the Hospital's.

Dietrich attempted surreptitiously (and failed) to get advice that would
allow his keeping and spending the insurance proceeds.

Dietrich did not compare his bills from the Hospital with his checks
and the Explanation of Benefits, which showed that the precise
amount of the checks he received should have been paid to the
Hospital.

Dietrich spent the $95,674.36, knowing of no alternative source from
which he could pay the Hospital.

For all these reasons, I find and conclude that the Hospital met its

burden of proving that Dietrich acted willfully and maliciously as those terms are

used in section 523(a)(6) when he spent the insurance proceeds and failed to pay

the Hospital for the services it rendered to him. The $93,674.36 debt Dietrich owes

to the Hospital is therefore nondischargeable under section 523(a)(6).

## D. <u>The Hospital met its burden of proving that the debt is not dischargeable under 11 U.S.C. §523(a)(2)(A).</u>

For the $95,674.36 debt to be found nondischargeable under section

523(a)(2)(A), the Hospital must establish that: (1) Dietrich expressly or impliedly

made a false representation; (2) Dietrich knew, or believed, the representation was

false at the time it was made; (3) the representation was made with the intent and

purpose of deceiving the Hospital; (4) the Hospital justifiably relied upon the

representation; and (5) the Hospital sustained damage as a proximate result of the

representation having been made. <u>Ricker</u>, 475 B.R. at 457.

Intent is a required element of section 523(a)(2)(A). The question of

whether a debtor had the requisite fraudulent intent to warrant a finding that a debt

is nondischargeable under section 523(a)(2)(A) is largely a subjective inquiry.

<u>Strominger v. Giquinto</u> (<u>In re Giquinto</u>), 388 B.R. 152, 165 (Bankr. E.D. Pa. 2008).

Because a debtor will rarely, if ever, admit that he intended deception, his

knowledge and intent to deceive may be inferred from the totality of the

surrounding facts and circumstances. <u>Martin v. Melendez (In re Melendez</u>), 589

B.R. 260, 265-66 (Bankr. E.D. Pa. 2018); <u>Giquinto</u>, 388 B.R. at 166. In addition,

courts may infer knowledge and intent to deceive from a debtor's reckless disregard for the truth. Melendez, 589 B.R. at 266; Giansante & Cobb, LLC v. Singh (In re Singh), 433 B.R. 139, 161 (Bankr. E.D. Pa. 2010). Finally, a creditor's reliance on a debtor's representation need not be reasonable. Rather, it need only be justifiable. Field v. Mans, 516 U.S. 59, 66-76 (1995).

Dietrich made false representations when he signed the Consents for Treatment, thereby representing that he would pay for the services rendered to him by the Hospital and that he assigned his interests in insurance proceeds to the Hospital. Furthermore, both Dietrich's knowledge of the falsity of these representations and his intent to deceive the Hospital may be inferred from the facts and circumstances of this case and Dietrich's reckless disregard for the truth. Dietrich knew, at the time he spent the proceeds of the insurance checks, that the Hospital was a non-participating provider with his insurance carrier, yet he admitted that he never took any steps to ask his insurance carrier or the Hospital how the Hospital would be paid. Each of the three insurance checks that were mailed to Dietrich had attached as the front sheets Explanation of Benefits forms that clearly identified that the checks were intended as payment for services rendered to Dietrich by the Hospital. In fact, these Explanation of Benefits forms specifically itemized the services with a description of the services and the date they were performed. In addition, Dietrich received from the Hospital invoices that

23

matched the Explanation of Benefits forms and the insurance checks. Nonetheless, Dietrich recklessly, and with reckless regard for the truth, ignored the bills and Explanation of Benefits forms, deposited the insurance checks into his personal bank account, spent the proceeds, and never paid the Hospital for the services it rendered to him.

Among the three checks he received was a check in the amount of $83,707.92. No evidence was presented that Dietrich was expecting to receive this substantial amount or the cumulative amount including the other two checks. Dietrich knew or absolutely should have known that he was not entitled to the insurance funds. From what source did he believe that the checks came to him as his money? None. Yet Dietrich recklessly disregarded the truth, ignored the Explanation of Benefits forms that accompanied the checks, ignored the bills he received from the Hospital that corresponded to the amounts of the checks, deposited the checks into his personal bank account, and spent the proceeds. Despite having converted the full amount of the insurance proceeds, Dietrich never paid the Hospital for the services it rendered to him.

From these facts and circumstances, I find and conclude quite easily that Dietrich acted recklessly, and with reckless disregard for the truth and intent to deceive the Hospital. I also find and conclude that the Hospital justifiably relied on Dietrich's promises, contained in the Consents for Treatment. Dietrich promised to

pay for the services the Hospital rendered to him and he assigned all insurance

proceeds to the Hospital. I further find that the Hospital suffered damage as a result

of Dietrich's false representation. The Hospital rendered medical services to

Dietrich justifiably relying on the representations contained in the Consents for

Treatment, but has never been paid for these services. For these reasons, I find and

conclude that the Hospital met its burden of proving that the $93,674.36 debt

Dietrich owes to the Hospital is also nondischargeable under section 523(a)(6).

# V. <u>CONCLUSION</u>

Upon the discussion above, I find and conclude that Dietrich acted

willfully and maliciously when he spent the insurance proceeds of $95,674.36 and

did not pay the Hospital for the services it rendered to him. The debt Dietrich owes

to the Hospital is therefore nondischargeable under section 523(a)(6). I also find

and conclude that Dietrich made false representations to the Hospital with intent to

deceive the Hospital, that the Hospital justifiably relied on the false statements, and

that the Hospital suffered injury as a result. The $95,674.36 debt is therefore also

nondischargeable under section 523(a)(2)(A). An appropriate Order follows.

BY THE COURT

Date:  December 13, 2018

RICHARD E. FEHLING
United States Bankruptcy Judge